28

Lisa FESANCO and Michael Fesanco,
Parents of MF, a Minor,
Petitioners,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,
Respondent.

No. 02–1770V.

United States Court of Federal Claims.

Filed: May 16, 2011.[1]

Lisa Fesanco, [redacted], Florida, and Michael Fesanco, [redacted], Florida, Pro se.

Vincent James Matanoski, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Respondent.

## MEMORANDUM OPINION AND FINAL ORDER

SUSAN G. BRADEN, Judge.

### I. RELEVANT FACTS.[2]

MF was born on [redacted], 1997 in [redacted], Illinois to Lisa and MF Fesanco (collectively hereinafter the "Petitioners"). Ex. C. On December 8, 1997, MF was released from the hospital. Ex. F at 2. From his date of birth until December 21, 2001,

1. Pursuant to Rule 18(b) of the Vaccine Rules of the United States Court of Federal Claims ("VRCFC"), this Memorandum Opinion and Final Order was initially filed under seal on May 5, 2011, and was held "to afford each party the opportunity to object to the public disclosure of any information furnished by that party." VRCFC 18(b). Some names and locations have been changed or redacted at the request of the parties.

2. The relevant facts herein were derived from medical records filed by Petitioners on April 8, 2008 ("Ex. A–Z") and August 28, 2008 ("Ex. AA–TTT").

MF received the following vaccinations: Diphtheria, Tetanus and Pertussis ("DTaP");[3] Polio ("IPV");[4] Measles, Mumps and Rubella ("MMR");[5] Haemophilus influenzae type b ("HbPv");[6] Hepatitis B ("Hep B");[7] Varicella;[8] and Prevnar.[9] Ex. E at 2. The DTaP, HbPv, and Hep B vaccinations that MF received contained thimerosal.[10] Ex. E at 2.

MF was seen by a pediatrician for checkups at 3 weeks, 2 months, 4 months, 6 months, 9 months, 1 year, 15 months, and 18 months. Ex. G at 13–25. On each occasion, the pediatrician's notes indicated that each examination was a "Normal exam—normal growth and development." Ex. G at 13–25.

On December 5, 1999, MF developed severe constipation that lasted for over a year. Ex. A at 5. At that same time, MF's parents began to notice regression in his speech and language. Ex. A at 5. On December 9, 1999, MF was seen by his pediatrician. Ex. G at 28. The pediatrician's notes from that examination state: "Lack of speech—dev delay—language." Ex. G at 28.

On February 8, 2000, MF was examined by a neurologist for the developmental issues noted by his pediatrician at the December 9, 1999 examination. Ex. H at 3–4. Following the examination, the neurologist observed:

> [MF] is a 2–year 2–month-old boy who is here because of his problems with temper tantrums and global developmental delay. He is not talking. He only has two words. He is very easily frustrated. He makes grunting noises. He does not follow any one-step commands.... He also has some fine and gross motor delays. He is also having some occasional staring episodes and some zoning out without any clinical seizures. There are a lot of sensory issues and he hits his hands into walls when he is really upset. He has been otherwise healthy.

Ex. H at 3.

As a result of these observations, the neurologist concluded: "[MF] has a global developmental delay with static encephalopathy of unclear etiology. He has significant speech delay." Ex. H at 4. On February 16, 2000, MF began speech and language occupational and physical therapy. Ex. I.

On July 27, 2000, MF was examined by a new pediatric neurologist, Dr. T. Ex. M at 2–3. On July 28, 2000, Dr. T diagnosed MF's condition as falling within the category of autism spectrum disorders ("ASD"). Ex. M at 3; *see also* Ex. T at 6 (diagnosis of autism by a neurologist at Miami Children's Hospital on June 26, 2002); Ex. II (professor of pediatrics at the University of Chicago Children's Hospital describing MF as "a 5–year-old white boy with high functioning autism"); Ex. OO at 2 (cardiologist at Children's Hospital of Wisconsin stating that her impressions

---

3. MF received DTaP vaccinations on February 6, 1998; April 3, 1998; June 4, 1998; March 11, 1999; and December 11, 2001. Ex. E at 2.

4. MF received Polio vaccinations on February 6, 1998; April 3, 1998; March 11, 1999; and December 11, 2001. Ex. E at 2. at 2.

5. MF received MMR vaccinations on December 17, 1998 and December 11, 2001. Ex. E

6. MF received HbPv vaccinations on February 6, 1998; April 3, 1998; June 4, 1998; and March 11, 1999. Ex. E at 2.

7. MF received Hep B vaccinations on December 6, 1997; February 6, 1998; and September 10, 1998. Ex. E at 2.

8. MF received a Varicella vaccination on December 17, 1998. Ex. E at 2.

9. MF received a Prevnar vaccination on December 5, 2000. Ex. E at 2.

10. Thimerosal is a "mercury-containing preservative formerly found in vaccines commonly administered to children.... In accordance with Food and Drug Administration (FDA) regulations that require the use of preservatives in multi-dose vials of vaccines to prevent fungal and bacterial contamination, thimerosal was added as a preservative to certain recommended pediatric vaccines—specifically the vaccines administered to protect against diphtheria, tetanus, pertussis, Haemophilus influenzae type b ... and hepatitis B." *Mead ex rel. Mead v. Sec'y of Health & Human Servs.*, No. 03–215 V, 2010 WL 892248, at *45–46 (Fed.Cl.Spec.Mstr. Mar. 12, 2010) (citations omitted); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1944 (31st ed. 2007) (thimerosal defined as "an organomercurial antiseptic, which is actively antifungal and bacteriostatic for many nonsporulating bacteria; used as a topical antiinfective and as a preservative in pharmaceutical preparations").

of MF's condition were "Speech and language delay, gross motor delay, [and] autism").

## II. PROCEDURAL HISTORY.

On December 3, 2002, Petitioners filed a *pro se* Short Form Autism Petition For Vaccine Compensation [11] ("Short Form Petition") with the Office of Special Masters of the United States Court of Federal Claims. On January 22, 2003, Special Master George L. Hastings, Jr. ("Special Master") issued a Notice Regarding "Omnibus Autism Proceeding" that stayed the proceedings in this case until the resolution of the OAP. On February 14, 2003, counsel for Petitioners entered an Appearance.

On March 3, 2003, the Government filed a Respondent's Report, to advise Petitioners of the need to file an affidavit and medical records, pursuant to 42 U.S.C. § 300aa–11(c) and VRCFC 2. On July 18, 2003, the Government filed a Motion For Appropriate Relief requesting that the Special Master not issue a Notice Advising Of A Right To Withdraw The Petition, pursuant to 42 U.S.C. § 300aa–12(g).

On August 4, 2003, the Special Master issued an Order suspending the proceedings for up to 180 days, pursuant to 42 U.S.C. § 300aa–12(d)(3)(C). On February 9, 2004, the Special Master issued a Denial Of Motion And Formal Notice that denied the Government's Motion For Appropriate Relief, and gave notice to Petitioners of their right to withdraw their Petition, pursuant to 42 U.S.C. § 300aa–21(b).

On August 9, 2007, Petitioners' counsel filed a Motion To Withdraw that the Special Master granted on August 15, 2007.

On February 15, 2008, the Special Master issued an Order directing Petitioners to: 1) establish that their Petition was filed within three years of the occurrence of the first

symptom of autism; and 2) complete the Petition by filing the statutorily required medical records. On April 9, 2008, Petitioners filed a set of medical records ("Ex. A–Z").

On May 27, 2008, the Government filed a Statement Regarding Jurisdiction And Appropriateness Of Proceeding Within The Omnibus Autism Proceeding. The Government's May 27, 2008 Statement indicates that, because the Government believes the Petition was timely filed and involves a diagnosed ASD, the Government does not oppose this case continuing within the OAP.

On June 2, 2008, the Special Master issued a Scheduling Order directing Petitioners to file the remainder of their medical records within 90 days. On August 28, 2008, Petitioners filed additional medical records ("Ex. AA–TTT").

On September 15, 2010, the Special Master issued an Order requiring Petitioners to advise how they intended to proceed, and offering Petitioners the opportunity to present additional evidence or theories to support their claim. On September 24, 2010, Petitioners filed a Statement Requesting The Court To Decide The Case Based On The Record. On November 9, 2010, the Special Master issued a Decision, denying Petitioners' claim.

On December 8, 2010, Petitioners filed a Motion For Review ("Pet. Mot."). On January 7, 2011, the Government filed a Response ("Gov't Resp.").

## III. DISCUSSION.

### A. Standard of Review.

■ The United States Court of Federal Claims may set aside of the decision of a special master if findings of fact or conclusions of law are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–

---

11. The Short Form Petition was developed for use in the Omnibus Autism Proceeding ("OAP") before the Office of Special Masters. *See Fesanco ex rel. Fesanco v. Sec'y of Health & Human Servs.*, No. 02–1770V, 2010 WL 4955721, at *1 (Fed.Cl.Spec.Mstr. Nov. 9, 2010) (*"Fesanco I "*). The OAP was a "general inquiry by the Office of Special Masters ... regarding the possible causal

relationship between certain vaccinations (*i.e.,* MMR vaccinations and thimerosal-containing vaccinations) and autistic spectrum disorders or similar neurodevelopmental disorders." 1/22/03 Notice Regarding "Omnibus Autism Proceeding" ¶ 1; *see also* http://www.uscfc.uscourts.gov/omnibus-autism-proceeding.

12(e)(2)(B). Findings of fact are reviewed under an "arbitrary and capricious" legal standard; conclusions of law are reviewed de novo. *Munn v. Sec'y of Dept. of Health & Human Servs.*, 970 F.2d 863, 870 n. 10 (Fed. Cir.1992).

## B. The Elements and Burden of Proof in Vaccine Act Cases.

The Vaccine Act provides that a petitioner may receive compensation and other relief under the Vaccine Injury Compensation Program ("Vaccine Program") if injury can be established either by causation in law or causation in fact. Causation in law is established if one of the vaccines listed in the Vaccine Injury Table at 42 U.S.C. § 300aa–14(a) ("Vaccine Table") was administered to a petitioner, and the "first symptom or manifestation of onset or of the significant aggravation of such injuries, disabilities, illnesses, conditions, and deaths" of specific adverse medical conditions associated with the use of each vaccine occurred within a time period specified in the Vaccine Table. *See* 42 U.S.C. § 300aa–14(a); 42 C.F.R. § 100.3(a). The Vaccine Table is to be read and interpreted by reference to "Qualifications and aids to interpretation," that define the key terms used therein. *Id.*

Congress also afforded a petitioner the opportunity to receive relief under the Vaccine Program, even if the time period for the first symptom or manifestation of a specified injury is not listed in the Vaccine Table. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii), § 300aa–13. Under these circumstances, a petitioner must establish causation in fact, *i.e.*, first, by establishing a *prima facie* case offering evidence of sufficient facts to establish each element of the claim and then by meeting a burden of proof as to each element of the claim by a "preponderance of the evidence" standard. *See* 42 U.S.C. § 300aa–13. Accordingly, a non-Vaccine Table petitioner must proffer at least some evidence as to each element of the claim and sufficient evidence to persuade the special master or court by a preponderance of evidence. *Id.*

In interpreting the Vaccine Act, the United States Court of Appeals for the Federal Circuit has held that a petitioner alleging a non-Table vaccine injury must proffer evidence that establishes causation in fact, by a "preponderance of evidence:"

> [A] proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, a petitioner must proffer a medical theory causally connecting the vaccination and the injury. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical *or* scientific explanation must support this logical sequence of cause and effect.

*Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed.Cir.1992) (citations omitted) (emphasis added); *see also Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed.Cir.1991) ("[P]etitioner's burden is not to show a generalized 'cause and effect relationship' with listed illnesses, but only to show causation in the particular case[.] [Otherwise,] a different and greater burden [would be placed] on petitioners than was enacted by Congress.").

In *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317 (Fed.Cir.2006), the United States Court of Appeals for the Federal Circuit re-affirmed the three-part test for determining causation in fact in non-Vaccine Table cases, established in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed.Cir.2005) ("*Althen*"), requiring that a petitioner

> show by preponderant evidence that the vaccination brought about [the] injury by providing:
>
> (1) a medical theory causally connecting the vaccination and the injury;
>
> (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and
>
> (3) a showing of a proximate temporal relationship between vaccination and injury.

*Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278).

If a petitioner is able to establish causation in fact, then the burden of proof shifts to the Government to establish that a factor unre-

lated to the vaccine was the actual cause of the petitioner's injury. *See* 42 U.S.C. § 300aa–13(a)(1)(B); *see also Althen*, 418 F.3d at 1278.

### C. *Pro Se* Litigants.

 The pleadings of a *pro se* Plaintiff are held to a less stringent standard than those of litigants represented by counsel. *See Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (holding that *pro se* complaints, "however inartfully pleaded," are held to "less stringent standards than formal pleadings drafted by lawyers") (internal quotation and citation omitted). Indeed, it has been the tradition of this court to examine the record "to see if [a *pro se*] Plaintiff has a cause of action somewhere displayed." *Ruderer v. United States*, 412 F.2d 1285, 1292 (Ct.Cl.1969). Nevertheless, while the court may excuse ambiguities in a *pro se* Plaintiff's complaint, the court "does not excuse [a complaint's] failures." *Henke v. United States*, 60 F.3d 795, 799 (Fed.Cir. 1995).

### D. Special Master Hastings's November 9, 2010 Decision.

The Special Master's November 9, 2010 Decision, the Special Master found that the medical records proffered by Petitioners contained no evidence that MF's injury was a "Table Injury." *Fesanco I*, 2010 WL 4955721, at *1. In addition, the Special Master determined that "the [medical] records do not contain a medical expert's opinion or any other evidence indicating that [MF]'s condition was vaccine-caused." *Id.*

The only evidence the Special Master found in the medical records that could support Petitioners' claim was a statement by one physician who was "'suspicious' that [MF]'s condition might be connected to his vaccinations." *Id.* (citing Ex. S at 9). That physician, however, "did not express an *affirmative opinion* that there was some type of causal connection." *Id.* (emphasis in original). Further, no treating physicians "expressed such an opinion." *Id.*

In addition, the Special Master also discussed evidence in the record that called into question whether autism "is an accurate de-scription of [MF]'s condition." *Id.* (citing Ex. V at 12; Ex. JJ at 2; Ex RR at 3). Although he did not make a finding as to whether MF's condition is properly characterized as autism, the Special Master observed that, regardless of MF's diagnosis, "clearly he has suffered from ongoing severe speech deficits, and social and mobility problems." *Id.*

For these reasons, the Special Master denied Petitioners' claim. *Id.*

### E. The Parties Arguments.
#### i. Petitioners' Objections.

Petitioners object to the Special Master's November 9, 2010 Decision on two grounds. First, Petitioners argue that the Special Master improperly commented upon "whether 'autism' is an accurate description of [MF]'s condition." Pet. Mot. ¶ 1. To the contrary, the Government conceded that this case involves an ASD, and the medical records also clearly show several diagnoses of autism. *Id.*

Petitioners also object to the Special Master's determination that MF's condition is not causally connected to the vaccines he received. Pet. Mot. ¶ 2. Specifically, Petitioners point to the November 14, 2002 examination of MF by Dr. S, Director of Clinical Immunology at **[redacted]**. *Id.* In his report on the November 14, 2002 examination, Dr. S stated:

> Studies done to look for evidence of heavy metals, especially lead or mercury, were negative even after chelation challenge. It does not rule out the possibility that [MF] had damage done by mercury when he was an infant and the mercury has since cleared by the damage to his central nervous system is still present.

Ex. U at 9.

Therefore, Petitioners claim that the proffered medical records and medical opinions show that MF's condition was vaccine-caused. Pet. Mot. ¶ 2.

#### ii. The Government's Response.

The Government responds that as to Petitioners' first objection, the Special Master never ruled that MF does not have autism. Gov't Resp. at 5. In fact, the Special Master

referenced MF's July 28, 2000 autism diagnosis. *Id.* Regardless of how the Special Master characterized MF's condition, the relevant issue is "whether [P]etitioners have proven that vaccines actually caused the problems." *Id.*

As to Petitioners' second objection, the Government argues that the medical records proffered by Petitioners do not support their claim. Gov't Resp. at 6. Following an examination of MF on August 5, 2002, Dr. S noted:

> [MF's] mother is concerned about a metabolic disorder or poisoning with either mercury from thimerosal in the vaccines or with other heavy metals.... The role of vaccines in general is not clear.... Whether or not it is the vaccine or the thimerosal or just the fact that autism develops at about [a] year and a half of age is not clear. Certainly these metals are toxic and can cause neurologic damage but whether or not there are sufficient levels in the body to do so it is not known.

Ex. U at 6.

Following a November 14, 2002 examination, Dr. S concluded that "as to whether or not there was enough thimerosal in [MF's] immunizations to cause mercury toxicity is still controversial and poorly supported by any data." Ex. U at 9.

These statements by Dr. S were made in 2002, "long before most of the studies pertaining to [thimerosal containing vaccinations] and autism were performed." Gov't Resp. at 7. In 2008, the special masters presiding over the OAP "heard extensive testimony over three weeks of trial regarding whether the amount of thimerosal in vaccines could cause neurologic problems. Whether thimerosal containing vaccinations contribute to the development of autism was the precise theory of causation presented by the [Petitioners in those cases] and ultimately rejected by the special masters due to a lack of persuasive, reliable evidence." Gov't Resp. at 7. Since Petitioners have not proffered any new medical opinions or evidence to support their claim that were not previously considered and rejected in the OAP, the Special Master in this case did not err in determining that Petitioners did not satisfy their burden of proof. Gov't Resp. at 8–9.

## F. The Court's Resolution.

Because ASDs do not appear on the Vaccine Table, as a matter of law, Petitioners must show that MF's vaccinations actually caused his condition. *See Althen,* 418 F.3d at 1278; *see also Hazlehurst v. Sec'y of Health & Human Servs.,* 604 F.3d 1343, 1349 (Fed. Cir.2010) (finding that ASDs are not on the Vaccine Table).

First, Petitioners must first establish "a medical theory causally connecting the vaccination and the injury." *Althen,* 418 F.3d at 1278. In the September 15, 2010 Order, the Special Master informed Petitioners that "[t]he three special masters assigned to hear the test cases [in the OAP each] ruled that there was no reliable evidence that the vaccines caused ASDs." Sept. 15, 2010 Order at 2. Therefore, the Special Master informed Petitioners that "unless you have different evidence or theories not presented in the test cases, the results in the test cases indicate that your claim is unlikely to be successful." *Id.* Petitioners declined to present any additional evidence, and requested that the Special Master decide the case based on the record "as it now stands."

The special masters in the OAP test cases all found that there is no causal link between the MMR vaccine, thimerosal containing vaccines, and ASDs. All of these cases were affirmed on appeal. *See Cedillo v. Sec'y of Health & Human Servs.,* No. 98–916V, 2009 WL 331968 (Fed.Cl.Spec.Mstr. Feb. 12, 2009), *aff'd,* 89 Fed.Cl. 158 (2009), *aff'd,* 617 F.3d 1328 (Fed.Cir.2010); *Hazlehurst v. Sec'y of Health & Human Servs.,* No. 03–654V, 2009 WL 332306 (Fed.Cl.Spec.Mstr. Feb. 12, 2009), *aff'd,* 88 Fed.Cl. 473 (2009), *aff'd,* 604 F.3d 1343 (Fed.Cir.2010); *Snyder v. Sec'y of Health & Human Servs.,* No. 01–162V, 2009 WL 332044 (Fed.Cl.Spec.Mstr. Feb. 12, 2009), *aff'd,* 88 Fed.Cl. 706 (2009); *Dwyer v. Sec'y of Health & Human Servs.,* No. 03–1202V, 2010 WL 892250 (Fed.Cl.Spec. Mstr. Mar. 12, 2010); *King v. Sec'y of Health & Human Servs.,* No. 03–584V, 2010 WL 892296 (Fed.Cl.Spec.Mstr. Mar. 12, 2010); *Mead v. Sec'y of Health & Human Servs.,*

No. 03–215V, 2010 WL 892248 (Fed.Cl. Spec. Mstr. Mar. 12, 2010).

■ In this case, Petitioners did not proffer a medical opinion or other piece of medical evidence that showed that MF's condition was vaccine-caused, even under a preponderance of the evidence standard. *See Althen,* 418 F.3d at 1278 ("[Petitioner]'s burden is to show by preponderant evidence that the vaccination brought about [the] injury....."). Although Petitioners argue that Dr. S's November 12, 2002 report establishes a link between thimerosal containing vaccines and MF's condition, the report only states that such a link cannot be ruled out. In a related vein, one of MF's other treating physicians indicated that he was "suspicious" that MF's condition may be related to the thimerosal in his vaccinations. Neither of these opinions, however, articulates an affirmative medical opinion of causation.[12]

For these reasons, the court has determined that Petitioners have failed to establish a causal link between MF's condition and the vaccinations he received. In addition, the court has determined that the Special Master's findings were not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). Accordingly, the Special Master did not err in denying Petitioners' claim.[13]

## IV. CONCLUSION.

For the reasons stated herein, the Special Master's November 9, 2010 Decision is affirmed.

**IT IS SO ORDERED.**

---

**12.** On April 18–25, 2011, the Public Broadcasting Service aired a series entitled, "Autism Now," that may be of interest to Petitioners. *See* PBS NewsHour–Autism Now. http://www.pbs.org/newshour/news/autism (last visited May 3, 2011).

**13.** Petitioners also object to the Special Master's statement that "certain specialists have questioned whether 'autism' is an accurate description of [MF]'s condition." *Fesanco I,* 2010 WL 4955721, at *1. Although the court understands

Petitioners' concerns about the nature of the Special Master's comments about MF's condition, these comments do not constitute reversible error.

